**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

           **Plaintiff,**

**vs.**                                  **Civ. No.  09-2047 JH**

**EDER ZAZUETA, CARLOS DIAZ-
ORTEGA, and JESUS BARBOA-
CECENA,**

           **Defendants.**

**<u>MEMORANDUM OPINION AND ORDER</u>**

      This case came before the Court at an evidentiary hearing held on Monday, January 11, 2010.  The subjects of the hearing were (1) *Defendant Eder Zazueta's Motion to Suppress* [Doc. No. 54] and (2) *Defendants' [Carlos Diaz-Ortega and Jesus Barboa-Cecena] Joint Motion to Suppress and Memorandum in Support Thereof* [Doc. No. 53].   Nicholas Jon Ganjei and Joel Meyers represented the United States, while Tom Jameson[1] represented Eder Zazueta ("Zazueta"), Erlinda Johnson represented Carlos Diaz-Ortega ("Diaz-Ortega"), and Jean McCray represented Jesus Barboa-Cecena ("Barboa-Cecena").   All three defendants were present at the hearing.  In ruling on these motions, the Court has relied upon the parties' briefs, the evidence presented at the hearing, and the written closing arguments filed by counsel.  The Court concludes that both motions should be granted in part and denied in part, as further explained herein.

**<u>FACTS</u>**

      Based upon the evidence presented at the hearing, the Court finds the following facts for the

---

[1] After the hearing, Mr. Jameson withdrew from the representation.  Fred C. Martinez now represents Eder Zazueta.

purposes of deciding the motions to suppress.

On July 8, 2009, at approximately 8:50 a.m., Defendants were driving north on I-25 near mile marker 454 in a rented gold Chevrolet HHR with an Arizona license plate. Defendant Eder Zazueta was driving the gold HHR. Officer John Valdez ("Valdez") of the New Mexico Motor Transportation Division was sitting in his police car, parked in the median of the highway. Valdez was watching the southbound traffic for motor vehicle violations. Another officer, known as Mares, was also parked in the median in his own police car, parked next to Valdez. While observing traffic, Valdez noticed Defendants' gold HHR driving northbound, approximately two to three car lengths behind another vehicle. Valdez commented to Mares, "that car was too close." Valdez testified that based on his training and experience, this was too close because the road was hilly and winding, and there was wildlife in the area. Accordingly, Valdez decided to pull over the HHR for a violation of N.M. Stat. Ann. § 66-7-318(A).[2] He followed the HHR, caught up to it, and pulled it over. Zazueta was driving, while Barboa-Cecena was in the front passenger seat and Diaz-Ortega was in the back seat. Officer Valdez parked behind the HHR, got out of his police car, and approached the HHR on the passenger side. The encounter was videotaped, and the government presented the video recording as evidence at the hearing. [Government's Ex. 4]

Through the open passenger side window, Valdez told the occupants that he initiated the stop because Zazueta was following the other car too closely. Zazueta did not deny it, but explained that he had been using the cruise control and had to use his breaks to avoid overtaking the other car while climbing the hill. Valdez then asked for Zazueta's license and registration, and when Zazueta

---

[2] The statute provides: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."

2

informed him that the car was rented, he also asked for the rental agreement.  Zazueta gave Valdez

the documents.  Valdez testified that during this time Zazueta's hands were shaking and that Barboa-

Cecena was flipping a Boost cell phone between his legs in a nervous manner.  According to Valdez,

Boost cell phones, when taken in conjunction with the totality of the circumstances, can be an

indicator of criminal activity because they are prepaid and therefore difficult to trace.  Valdez also

testified that there was an overwhelming chemical odor coming from inside the car, though he was

unable to describe the odor.  Valdez returned to his police car to process the traffic citation.

Valdez sat in his police car to fill out the traffic citation, spending about seven minutes there.

He then got out of his car and motioned to Zazueta to get out of the HHR.  Zazueta did so, and

together they walked to the front of Valdez' patrol car.  Valdez asked Zazueta where he was headed,

and Zazueta responded, "Denver."   Valdez returned Zazueta's license, registration and rental

agreement, and asked Zazueta for his current address in Phoenix.  Zazueta said it was on the one on

his driver's license.  Valdez asked Zazueta why he was nervous, and Zazueta responded that he was

just tired.  Valdez asked Zazueta what was going on in Denver, and Zazueta responded that he was

going there to look for a construction job installing sheet rock.  Valdez asked Zazueta questions

about what construction company he worked for or what company had called him to do the work.

Zazueta responded that it was not a company, but  "some guy" who needed some work done on a

house.  The videotape shows Zazueta touching his head or face five times during this exchange,

which Valdez testified he interpreted as a sign of nervousness.  Then, Valdez told Zazueta to wait

by his police car while he checked the VIN number of the HHR.  Valdez walked up to the HHR's

driver's side front door and opened it, glancing only briefly at the door jam.  While he had the door

open, Valdez greeted and spoke to Barboa-Cecena, asking him where they were going.  Barboa-

Cecena reported that they were going to Denver.  Valdez asked what they were going to do there,

and Barboa-Cecena replied that they were going for construction work.  Valdez asked Barboa who Zazueta was.  In response to Valdez' inquiries, Barboa-Cecena knew Zazueta's first name but not his last name.  Valdez asked Barboa how long he had known Zazueta, and Barboa-Cecena said that he had not known him very long.

Valdez then returned to Zazueta, who was still waiting in front of the patrol car, behind the HHR.  Valdez explained the citation to Zazueta, who agreed to plead guilty to the citation and signed it.  Zazueta said that he understood the citation.  Valdez handed Zazueta a copy of the citation.  Valdez explained to Zazueta where to mail in his payment for the ticket and wished him a "safe one."  With that, Zazueta took his documents and began walking back to the HHR, and Valdez turned back towards his police car.  A few seconds later, Valdez called Zazueta back, saying "Eder!  Do you have anything illegal in the vehicle today?"   Upon hearing his name, Zazueta immediately turned around and walked back to Valdez, denying that he had anything illegal.  Valdez said, "let me tell you what would be considered illegal," and that he meant something like marijuana or cocaine.  In response to Valdez' questions, Zazueta shook his head no and said that he already had a prior felony conviction for discharging a weapon and that he "doesn't mess around like that." In response to Valdez' question, Zazueta said that he had rented the car and was responsible for everything in the HHR except for the passengers' luggage.  Valdez asked Zazueta how long he had known the men inside the HHR; Zazueta responded that he used to work with them.  Valdez asked how long they were going to spend in Denver, and Zazueta said that he did not know how long the job would take, but that he had rented the car for a week.  At the hearing, Zazueta testified that he did not feel free to decline to answer Valdez' questions.  At this point, Valdez asked, "Any problem if I search that vehicle?"  Zazueta responded, "You can go ahead and search it if you want."  Zazueta gave his consent just over a minute after Valdez told Zazueta to have a "safe one."  At Valdez'

4

request, Zazueta filled out and signed a written consent form.  While he did so, Valdez approached the HRR and spoke to the two passengers, Diaz-Ortega and Barboa-Cecena, in Spanish.  Valdez asked them, "Can I search this vehicle, no problem?", and they assented.  Both passengers testified that they did not feel that they had any choice but to give their consent and that they did not feel free to leave.  Valdez instructed them to get out of the car.  Valdez patted down all three men and directed them to sit on the side of the road away from the HHR.

Valdez searched the HHR   Eventually, he noticed tool marks in the right rear cargo area. After retrieving some tools and dismantling some of the rear cargo compartment, he found three packages of crystal methamphetamine.  Valdez placed all three defendants under arrest.  Valdez gave Zazueta *Miranda* warnings, at which point Zazueta made incriminating statements to both Valdez, and later, to DEA agents.  At some point during this encounter Officer Mares pulled up to the scene in his own police car and parked behind and to the right of Valdez' police car.  However, there is no evidence in the record regarding when he arrived.  The videotape shows that Mares did not interact with any of the Defendants during either the initial traffic stop, the continued questioning, the search of the HHR, or during Defendants' roadside arrest.

All three defendants testified at the January 11, 2010 hearing.  Their testimony revealed that Diaz-Ortega had taken an eight to nine hour  turn driving the HHR before the traffic stop occurred. Zazueta testified that Diaz-Ortega had "helped" pay for the rental fee, while Diaz-Ortega testified that he assisted in renting the car and that he paid the rental fee by giving cash to Zazueta—he did not pay the rental car fee directly to the company.  Special Agent Douglas Gooch confirmed that in a post-arrest interview, Zazueta had stated that Diaz-Ortega had provided him with money to pay for the rental car.  Diaz-Ortega further testified that while he did not sign the rental contract, he had a verbal agreement with Zazueta.  However, there is no evidence in the record as to the scope or

5

nature of the verbal agreement.  Furthermore, Zazueta and Barboa-Cecena testified that the car had

no chemical smell or other odor.

Zazueta has filed a motion to suppress the methamphetamines, any other items found in the

HHR, and any statements he gave to law enforcement after the stop.  Barboa-Cecena and Diaz-

Ortega have filed a joint motion to suppress "all evidence seized on July 8, 2009."

### DISCUSSION

I.    **Did Valdez Have Reasonable Suspicion to Conduct a Traffic Stop, and Was It Reasonable In Scope?**

Barboa-Cecena and Diaz-Ortega move to suppress on the grounds that Valdez lacked

reasonable suspicion to conduct the initial stop of the HHR in which they were passengers.[3]

A routine traffic stop is indisputably a seizure within the meaning of the Fourth Amendment.

*United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1226 (10th Cir. 2008).  However, because a

traffic stop is "necessarily [a] swift action predicated upon the on-the-spot observations of the

officer on the beat," an officer need only reasonably suspect that a crime is in the offing to justify

such a detention.  *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968).  *Terry* set forth a two-step framework

for determining the constitutional scope of a traffic stop: (1) the stop must be "justified at its

inception," and (2) the resulting detention must be "reasonably related in scope to the circumstances

that justified the stop in the first place."  *United States v. Winder*, 557 F.3d 1129, 1133-34 (10th Cir.

2009) (quotations omitted).  "Generally, an investigative detention must last no longer than is

necessary to effectuate the purpose of the stop."  *Id*. at 1134 (quotation omitted).  Reasonable

suspicion arises when "an officer of reasonable caution" has a "particularized and objective basis

for suspecting the person stopped of criminal activity" judged against the totality of the

_____

[3] Zazueta did not challenge the legality of the traffic stop.

circumstances. *Id*. at 1133-34 (quotations omitted). A mere hunch or conjecture will not suffice. *United States v. Karam*, 496 F.3d 1157, 1162 (10th Cir. 2007); *see also United States v. Caro*, 248 F.3d 1240, 1246 (10th Cir. 2001). Although the detaining officer's subjective motivations are irrelevant to the inquiry, the court may weigh objectively reasonable mistakes of fact made by the officer in favor of reasonable suspicion. *Winder*, 557 F.3d at 1134. A traffic stop does not offend the Constitution if it is based upon "an observed traffic violation or . . . reasonable articulable suspicion that [an actual] traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

The government contends that Valdez observed Zazueta following too closely in violation of NMSA 1978, § 66-7-318, and therefore the traffic stop was justified. That statute states, in relevant part, that "The driver of a motor vehicle shall not follow another vehicle more closely than is *reasonable and prudent*, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." (emphasis added).

In their initial briefs, Defendants Diaz-Ortega and Barboa-Cecena argue that Valdez did not have reasonable suspicion to conduct the traffic stop in this case, but that rather his stop was pretextual.[4] Alternatively, defendants argue that even if Valdez observed what he believed was Zazueta's vehicle following too closely, it was objectively unreasonable for him to stop the HHR. They contend that § 66-7-318 "does not give officers car [sic] blanche to stop someone at random

---

[4] In a pretextual stop, as defined in *United States v. Guzman*, 864 F.2d 1512 (10th Cir. 1988), the officer "use[s] a legal justification to make the stop in order to search a person or place . . . for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." However, in 1995 the Tenth Circuit overruled *Guzman* in *Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995), in which it articulated a new standard: a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.

simply because the officer subjectively believes the stopped vehicle had been following another vehicle "too closely."  Defendants argue that Valdez does not understand the statute, and that therefore he lacked reasonable suspicion.  Defendants argue that Valdez' assertion that he pulled over the HHR for following just two to three car length, without more, cannot legally be the basis for pulling over the vehicle because "Valdez failed to articulate how the driver's actions amounted to unreasonable and imprudent actions."  They claim that Valdez failed to understand the plain language of § 66-7-318, and that this failure to understand the law he was supposedly enforcing is unreasonable, making the traffic stop unlawful.  Finally, Diaz-Ortega and Barboa-Cecena also contend that the videotape of the stop does not show the HHR following too closely behind another vehicle.

The Court disagrees with the Defendants on each of these points.  The phrase "reasonable and prudent" in § 66-7-318 requires one to look at the context of the road conditions to determine the propriety of the stop.  Valdez testified that Zazueta was following two or three car lengths on a section of roadway that was winding and hilly, that wildlife is present in the area, and for that reason the speed limit was reduced to 55 mph on that stretch of interstate highway, in contrast to the higher speed limits on interstates in other parts of New Mexico.  Valdez testified that in his experience, two to three car lengths was unreasonably close under those circumstances.  Thus, Valdez made the decision to conduct the stop with due regard for the speed of traffic and the highway conditions as the statute demands, and he had reasonable suspicion to stop the HHR for following too closely.  Furthermore, Zazueta admitted to the violation and signed the ticket.  Finally, the Court is not persuaded by the fact that the beginning of the videotape does not show the HHR following too closely behind another car.  It is clear from the evidence that by the time the recording started, the HHR had already slowed down considerably and was about to pull onto the shoulder in

8

response to Valdez having engaged the lights on his police car. It is not surprising, then, that the distance between the HHR and the other vehicle had already widened at that point. Thus, the traffic stop was reasonable at its inception.

In his written closing argument, Defendant Barboa-Cecena suggests that the traffic stop was unreasonable in its scope. Specifically, he argues that it was unreasonable for Valdez to keep the Defendants waiting for approximately seven minutes while he filled out the relatively short citation form (Government's Exhibit 1). According to Barboa-Cecena, Valdez should have been able to fill out the form in less than a minute, and he points out that Valdez testified that he could not recall performing any other tasks during that period of time. The Court declines to conclude that anything over one or two minutes is an unreasonable amount of time to fill out a traffic citation. In addition to the license and registration, Valdez was reviewing the rental agreement and transferring information from these documents onto the citation form. Certainly, under the circumstances there is a range of time that may be deemed reasonable for filling out the citation, and the Court concludes on the facts presented here that seven minutes, while perhaps on the longer end of that range, is still a reasonable amount of time under the circumstances. Thus, the traffic stop was reasonable in scope.

Thus, the Court finds that Valdez had reasonable suspicion to conduct the traffic stop and that the stop was reasonable in its scope.

## II.    Did Valdez Have Consent or Reasonable Suspicion to Detain Zazueta After the Purpose of the Traffic Stop Was Completed?

The court should assess the reasonableness of a traffic stop based on an observed violation by considering the scope of the officer's actions and balancing the motorist's legitimate expectation of privacy against the government's law-enforcement-related interests. *United States v. Holt*, 264

F.3d 1215, 1220 (10th Cir. 2001).  For example, when stopped for a traffic violation, a motorist expects "to spend a short period of time answering questions and waiting while the officer checks his license and registration."  *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).  At the same time, the government has a strong interest in ensuring that motorists comply with traffic laws.  *See Whren v. United States*, 517 U.S. 806, 818 (1996) (noting the "usual rule that probable cause to believe the law has been broken 'outbalances' private interest in avoiding police contact").  Thus, it is beyond dispute that an officer may ask questions relating to the reason for the stop.  Ordinarily, this also includes questions relating to the motorist's travel plans. *See, e.g., United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

Although an officer may effect a stop once he observes conduct that leads him "reasonably to conclude" that criminal conduct "may be afoot," termination of the encounter is required once the officer's suspicion is dispelled and probable cause fails to develop.  *United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993); *see also Illinois v. Wardlow*, 528 U.S. 119, 126 (2000) ("If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way.").  At this point, the detention is no longer reasonable, as the officer's concerns have proven illusory.  *See Peters*, 10 F.3d at 1522.  Tenth Circuit precedent is clear that unless the officer obtains "a new and independent basis" for suspecting the detained individual of criminal activity, his investigation must end.  *Id.*

Zazueta argues that once Valdez completed the process of issuing the citation, he was obligated to permit Zazueta to continue on his way *unless* either Zazueta consented to continued detention or Valdez had reasonable suspicion of further criminal activity.  Zazueta argues that neither was present here, and that therefore the illegal continued detention tainted his consent to search the HHR.

10

A.       **Consent to the Continued Detention**

With regard to consent to the continued detention, Zazueta argues that when Valdez called him back to the patrol car mere seconds after telling him to have "a good one" and asked him intimidating, incriminating questions, Valdez detained him–in other words, a reasonable person would not have felt free to leave.  He contends that this was not a consensual encounter to which he voluntarily consented, but rather a continuation of the traffic stop, the purpose of which had already been completed.  He points out that although Valdez had returned his documents, that alone is not dispositive.  Indeed, the Tenth Circuit has held that while returning a driver's documents is necessary to show that the police-citizen encounter was consensual, it may not always be sufficient. *See United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994) and *United States v. Soto*, 988 F.2d 1548, 1557 n. 5 (10th Cir. 1993).  In determining whether consent is voluntary when given following the return of defendant's documents, the court should look at such factors as whether the officer informed the defendant that he was free to leave the scene or that he could refuse to give consent. *McSwain*, 29 F.3d at 563.  Also of importance are whether the officer displayed a weapon, touched the detainee, used a commanding tone of voice, and the nature of the words used.  *See United States v. Sandoval*, 29 F.3d 537, 540-42 (10th Cir. 1994).

In this case, Valdez had just handed Zazueta's documents to him and had told him to have a "safe one," when he called out his name, "Eder!" and asked if he had anything illegal in the HHR. Arguably, therefore, Valdez was still in control of the situation, and he launched almost immediately into questions about criminal activity.  Furthermore, Valdez never told Zazueta that he was free to leave, and he did not ask Zazueta's permission to ask him more questions. The foregoing facts do not weigh in favor of a conclusion that the encounter was consensual.

On the other hand, these are outweighed by many facts that do indicate that the traffic stop

11

ended and became a consensual encounter.  Valdez was alone at the scene, and he did not touch Zazueta.  He did not brandish his weapon (though it was visible on his belt), nor did he loom over Zazueta, stare at him, or use intimidating body language.  Valdez did not raise his voice, use a commanding tone, or use inappropriate language.  The encounter took place on a freeway, in broad daylight, in full public view.  Valdez promptly returned Zazueta's documents and wished him a good day, effectively ending the traffic stop.  And, Zazueta possessed an unobstructed pathway back to his car, which also possessed an unobstructed path back to the freeway.  As the government points out, Valdez was not required to tell Zazueta that he was free to leave, *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005), but that in any event he told Zazueta to "have a safe one," which amounts to the same thing.   Finally, in *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007), the Tenth Circuit affirmed the district court's determination that a detention ended when a police officer returned a defendant's documents, thanked him for his time, and began to walk away, but then very shortly thereafter turned around and resumed questioning the defendant.  The Tenth Circuit reasoned that the second officer at the scene was in the patrol car and had no contact with the defendant, and the patrol car was parked near the defendant's car but did not block its exit.  The Tenth Circuit thus concluded that the remainder of the interaction was consensual.  *See also United States v. Villa*, 589 F.3d 1334, 1340 (10th Cir. 2009) (finding that defendant was free to decline to answer officer's additional questions after traffic stop, despite the fact that officer was uniformed and armed, and she was still in the process of exiting his patrol car when he began asking additional questions); *United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006) (concluding that encounter after a traffic stop was consensual even though suspect was not told that he was free to leave, where police returned the suspect's documents, displayed no intimidating behavior, and provided him with a clear path back to his own vehicle); *United States v. Martinez*, 537 F. Supp. 2d

1153, 1159 (D. Kan. 2008) ("The fact that Trooper Dean turned around very shortly after returning the papers and resumed his questioning is not coercive.").  Finally, Zazueta's subjective belief regarding whether he was free to leave is irrelevant, as the standard is one of objective reasonableness.  Based on the foregoing Tenth Circuit authorities, the Court concludes that with regard to Zazueta, the continuation of the stop was consensual and therefore valid.

### B.     Reasonable Suspicion to Detain Zazueta

Even if the post-traffic stop encounter between Valdez and Zazueta was not consensual, it is still constitutional if Valdez possessed reasonable suspicion to detain Zazueta.  With regard to reasonable suspicion, the government must show that Valdez had a particularized and objective basis for the conclusion that criminal activity was afoot.  *Poolaw v. Marcantel*, 565 F.3d 721, 736 (10th Cir. 2009).  Reasonable suspicion is defined as "particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).  In assessing reasonable suspicion, the court should defer to trained law enforcement personnel, "allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418).  "The evaluation is made from the perspective of the reasonable officer, not the reasonable person." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003).  The Supreme Court has instructed the lower courts to not examine each factor adding up to reasonable suspicion individually, but that we evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct.  In *Arvizu*, the Supreme Court rejected what it called a "divide-and-conquer analysis," noting that reasonable suspicion may exist even if "each observation" is "susceptible to an innocent explanation."  *Arvizu*, 534 U.S. at 274.

13

1.      <u>**What Evidence May Be Considered?**</u>

The first question to be decided is whether the Court may consider evidence gathered by Valdez while he was supposedly looking at the VIN number on the doorjamb of the HHR.  While Valdez stood in the open doorway, he conversed with Barboa-Cecena and discovered that the passenger could not provide Zazueta's last name, even though he had worked with him in the past and was traveling with him out of state.  Defendants argue that Valdez' act of opening the car door to see the VIN, when instead it was clearly visible through the front windshield, was an illegal search of the car and that Barboa-Cecena's statements are the poisonous fruit of that search.  Therefore, Defendants contend that those statements cannot be used to determine whether Valdez had reasonable suspicion, and should be suppressed.  The Court agrees.

In *United States v. Caro*, 248 F.3d 1240 (10th Cir. 2001), an officer conducted a traffic stop of a vehicle with window tinting that was impermissibly dark.  The officer's initial conversations with the driver and review of the driver's documents revealed that the driver was not the registered owner, the car was grey but the registration said it was maroon, the driver was nervous, and the driver could not recall the last name of the registered owner.  All of the foregoing made the officer suspect that the car might have been stolen.  The officer compared the VIN visible on the dashboard to that on the registration and found that they matched.  Despite that, the officer then asked the driver to get out of the car so that he could compare the VIN on the door jam.  The driver complied, and during that process the officer noticed  several air fresheners hanging from the dashboard and a bottle of air freshener in the console.  This made him suspicious that there were drugs in the car, so he asked the driver for permission to search the vehicle.  The driver consented, and the resulting search revealed drugs.  The driver moved to suppress on the grounds that the police officer exceeded the lawful scope of the detention.  The *Caro* court held, "where the dashboard VIN plate is readable

14

from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with, there is insufficient cause for an officer to extend the scope of a detention by entering a vehicle's passenger compartment for the purpose of further examining any VIN." *Id.* at 1246. Based on *Caro*, Zazueta argues that Valdez invaded the private space of the HHR and unconstitutionally exceeded the scope of the initial detention, and therefore Valdez could not use any evidence obtained through that maneuver to establish reasonable suspicion—specifically, the fact that Barboa-Cecena did not know Zazueta's last name.

In response, the government does not argue that Valdez did not violate the principles announced in *Caro*. Instead, the government contends that Zazueta's argument fails because he cannot demonstrate a nexus between the inspection of the VIN on the doorjamb and the evidence he seeks to suppress. Citing *United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006), the government argues that "evidence cannot be suppressed as fruit of poisonous tree unless an unlawful search is, at a minimum, the 'but-for' cause of its discovery." In *Chavira*, the government admitted that the police officer in question violated the constitution by inspecting the VIN number on the doorjamb of a car. Sometime after that search, drugs were found in the gas tank. However, the evidence was not fruit of the poisonous tree because there was no causal connection between its discovery and the illegal search of the doorjamb:

> Mr. Chavira cannot rely upon the fruit of the poisonous tree doctrine because he has failed to demonstrate a nexus between the inspection of the VIN located on the doorjamb and the evidence he now seeks to suppress. . . . Evidence will not be suppressed as fruit of the poisonous tree unless an unlawful search is at least the but-for cause of its discovery. Even then, causation is often so attenuated that suppression is not justified. We have described the but-for relationship as a factual nexus between the illegality and the challenged evidence. To establish the factual nexus, at a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.

*Chavira*, 467 F.3d at 1291.  According to the government, while Valdez happened to ask Barboa-Cecena questions while he was looking at the doorjamb, he could have just as easily asked those questions through the open driver's side window while reading the VIN off the dashboard.  Further, the government distinguishes *Caro* on the grounds that the doorjamb inspection there enabled the officer to discover the air fresheners that, but for that search, would have remained undiscovered.  In contrast, the government contends that Valdez had multiple opportunities to speak to Barboa-Cecena.

The Court concludes that *Chavira* is distinguishable.  In the  doorjam VIN inspection in that case, the officer found no evidence either to support reasonable suspicion or evidence sought to be suppressed.  That is in contrast to this case, where Valdez obtained evidence in support of reasonable suspicion—the statements of Barboa-Cecena—while actively conducting the illegal doorjamb search.  Thus, the causal connection is present.  Furthermore, in an unpublished Tenth Circuit decision, *United States v. Pina-Aboite*, 109 Fed. Appx. 227 (10th Cir. 2004) (unpublished), the court found that an officer violated *Caro* by checking the VIN on the dash and then opening the door to check the VIN on the doorjamb.  During that check of the interior VIN, the officer questioned the passenger about his and the driver's travel plans.  Their stories did not match, which further aroused the officers's already-heightened suspicion.  The Tenth Circuit held that under *Caro*, the passenger's statements would be suppressed as the fruit of an illegal search, and therefore could not contribute to the officer's reasonable suspicion of illegal activity.  *Id*. at 235.  Therefore, the Court concludes that Barboa-Cecena's statements revealing that he did not know Zazueta's last name should be suppressed and cannot be used to evaluate reasonable suspicion.

## 2.    Did Valdez Have Reasonable Suspicion?

The government points to the following factors, in their totality, as support for reasonable

suspicion.  The Defendants were traveling from Phoenix, Arizona to Denver, Colorado—a round trip distance of over 1600 miles—for a potential sheet rock job of uncertain scope and duration. Despite this, Zazueta could not provide Valdez with a company name or job site location, nor the name of the person who called him about the job.  Barboa-Cecena was "nervously flipping" a cell phone between his legs throughout the stop.  Valdez noticed that the phone in question was a Boost Mobile, which are prepaid and require no contract, and therefore according to Valdez are known tools of the drug trade.  Zazueta was nervous during his interaction with Valdez, and his hands were shaking when he handed Valdez his documents—though this was not visible on the videotape. Zazueta's nervousness did not diminish during the stop, and he continued to touch his face and rub his head throughout the encounter.  In addition, Valdez detected a "strong chemical odor" coming from the rental car once he made contact with the Defendants.

Defendants correctly point out that perceived nervousness, alone, is insufficient to support reasonable suspicion.  *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998).  The Tenth Circuit has stated, "nervousness is a sufficiently common–indeed natural–reaction to confrontation with the police" and has "limited significance in determining whether reasonable suspicion exists" unless the nervousness "is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion."  *United States v. Santos*, 403 F.3d 1120, 1127 (10th Cir. 2005). However, the government contends that the nervousness should be considered in totality with all the other evidence.  This, in fact, is the law in the Tenth Circuit.  *See United States v. Villa*, 589 F.3d 1334, 1340-41 (10th Cir. 2009) (driver's inconsistent and implausible story regarding her travel plans, along with her nervousness, were adequate basis for reasonable suspicion); *United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009) (stating that although nervousness alone cannot support reasonable suspicion of criminal activity, Tenth Circuit will consider an officer's observation of

nervousness, and particularly extreme nervousness, in weighing the totality of the information available to the officer.).  Here, the Court finds credible Valdez's testimony that Zazueta and Barboa-Cecena appeared unusually nervous, and that their nervousness did not subside over the course of the encounter.  Thus the Court includes that their nervousness is one of several factors supporting reasonable suspicion.  Defendants point out that Valdez had never met any of them before and therefore had no basis upon which to judge their behavior as "nervous."  As such, they contend that Valdez' claim that they were nervous amounts to nothing more than a hunch.  Of course, it is usually the case that the police officer does not know the occupants of the car he has pulled over.  Despite that, in the Tenth Circuit the officer's assessment of nervousness is a permissible factor to be considered.

Defendants also insist that there was no chemical odor in the car, as Valdez asserts.  They claim that meth is odorless, and that, in fact, nothing was ever found in the HHR that would result in a strong chemical odor.  However, they also argue that unless an officer can link it to illegal activity, an undifferentiated chemical odor adds little in support of reasonable suspicion.  Defendants point out that Valdez does not connect the smell to any illegal activity.  It is true that in *United States v. Little*, 18 F.3d 1499, 1506 (10th Cir. 1994 ) (en banc),  the Tenth Circuit stated that "[a]n unidentified chemical smell emanating from an unlabelled piece of luggage is not, *by itself*, sufficient to create reasonable suspicion." (emphasis added).  However, in this case the government relies upon the odor as just one of several factors under the totality of the circumstances.  Furthermore, as to the remaining factors, the Court agrees that Valdez' vague story about a sheet rock job in Denver, and his inability to provide Valdez with any details about the work or who he would be working for, were suspicious.

The Court concludes that while it is a close question, Valdez did have reasonable suspicion

18

to conduct the post-traffic stop encounter with Zazueta based upon his incomplete answers to his questions regarding Defendants' travel and work plans, Zazueta and Barboa-Cecena's apparent nervousness, Barboa-Cecena's use of an untraceable Boost mobile phone, and the unidentified chemical smell in the car.

## III.    THE SEARCH OF THE HHR

### A.    Who Has Standing to Challenge the Search?

All three Defendants challenge Valdez's search of the HHR as a violation of their Fourth Amendment rights.  The United States does not dispute that Zazueta, who rented the HHR and signed the rental contract, has standing to challenge the search of the car.  However, the government contends that the passengers, Diaz-Ortega and Barboa-Cecena, lack standing to challenge the search of the car, and that they have a protected privacy interest only in their own baggage.

It is undisputed that passengers in a vehicle have standing to challenge the initial traffic stop and resulting detention, *Brendlin v. California*, 551 U.S. 249, 255-56 (2007).  However, the passengers' right to contest a subsequent search not of his or her person but of the vehicle remains another question.  In *Rakas v. Illinois*, 439 U.S. 128 (1978), the Supreme Court held that a passenger who lacked a property or possessory interest in the automobile or property seized lacked standing to challenge a search of the car.

In this case, there is evidence that Diaz-Ortega accompanied Zazueta when he rented the HHR, and that while Zazueta paid the rental company himself and signed the rental agreement, Diaz-Ortega paid Zazueta some amount of cash for the car rental.  There is also evidence that Diaz-Ortega drove the car for eight to nine hours before Zazueta took his turn driving.  Diaz-Ortega testified that he and Zazueta had a "verbal agreement" regarding the car, but there is no evidence

regarding the details of that agreement.  In contrast, there is no evidence that Barboa-Cecena had any sort of possessory interest in the HHR.

Based on the foregoing, the Court concludes that Defendant Diaz-Ortega did have a possessory interest in the HHR and therefore has standing to challenge the search of the vehicle. However, there is no evidence that Barboa-Cecena had a similar interest, and therefore he lacks standing to challenge the search of anything other than his luggage.

Accordingly, as to Barboa-Cecena the motion to suppress the fruits of the search will be denied.

**B.**      **Diaz-Ortega and Barboa-Cecena**

The passengers, Diaz-Ortega and Barboa-Cecena, argue that Valdez improperly detained them after the conclusion of the traffic stop while he performed a search of the HHR.  They contend that though they gave him their consent to search their vehicle, their consent to a prolonged detention and search was not voluntarily given.  Accordingly, they contend that the search and their prolonged detention was improper.[5]

As described above, after the traffic stop Valdez approached the passenger side window and asked the pair, in Spanish, "Can I check this car?  No problem?"  They contend that, as passengers who remained in the vehicle during discussions between Valdez and Zazueta, they had no way of knowing that the traffic stop had ended and that Zazueta had consented to a new encounter, and therefore could not possibly know that they might be free to leave.   Rather, they believed they continued to be seized and had no other choice but to acquiesce to Valdez's request to search the HHR.  Whether an encounter can be deemed consensual depends on whether the police conduct

_____

[5] Because he lacks standing to challenge the search, this argument is moot as to Barboa-Cecena.

would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.  The passengers argue that was the case here, citing *United States v. Guerrero-Espinoza*, 462 F.3d 1302 (10th Cir. 2006).

Whether a defendant's consent was given voluntarily is a question of fact determined from the totality of the circumstances.  *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000).  The Tenth Circuit has utilized a two-part test to make this determination: "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely given.'  Furthermore, the government must prove that this consent was given without implied or express duress or coercion."  *See United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (quoting *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)).  "In determining whether a consent to search is voluntary, a court should consider the following: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant."  *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994).  Other factors tending to show that consent was coerced include the presence of more than one officer, the display of weapons, physical touching, and use of an aggressive tone.  *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991).  In general, "the presence of more than one officer increases the coerciveness of an encounter," but that alone does not render consent per se involuntary.  *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir.1993) (internal quotation omitted) (finding that presence of five officers did not by itself render consent involuntary).  In all, the court should consider whether the officer's conduct constituted a coercive show of authority, such that a reasonable person would believe he was not free to "decline the officer's requests or otherwise terminate the encounter."  *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (quotation omitted).  It is well established that "knowledge of the right to refuse consent" is not "a

necessary prerequisite to demonstrating a 'voluntary' consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 232-33 (1973).

Here, none of the factors supporting coercion were present.  Valdez did not mistreat the defendants; use violence, threats, promises, deception or trickery; touch the defendants; or use an aggressive tone.  Valdez was wearing his sidearm, but did not brandish it at the defendants.  If indeed Officer Mares was present by this time, which is unclear, he was certainly in the background and had no interaction with Barboa-Cecena or Diaz-Ortega.

Thus, the only remaining argument to support a claim of coercion is Defendants' argument that they reasonably believed that they were still under the constraint of the traffic stop and therefore could not have felt free to decline Valdez's request to search the HHR.  The Tenth Circuit's decision in *United States v. Guerrero-Espinoza*, 462 F.3d 1302 (10th Cir. 2006) is very similar and therefore instructive.  In that case, the defendant was a passenger in a van that was pulled over for a traffic stop.  At the conclusion of the traffic stop, the officer approached the defendant passenger and asked for his consent to question him.  Although the officer had completed the traffic stop by returning documents and issuing a warning to the driver, those events took place in the officer's patrol car while the defendant remained in the van.  Furthermore, the driver did not return to the van after leaving the patrol car, but instead stood outside answering further questions from the officer, and later the driver remained standing at back of the van while the officer approached the defendant to ask him further questions. Therefore, the defendant consented to the questioning while unaware that the traffic stop had concluded.  In light of these facts, the Tenth Circuit concluded that a reasonable person in the defendant's position would not have realized that traffic stop of the van in which he was passenger had ended, and therefore would not have felt free to decline to answer the officer's questions or to leave the scene of the traffic stop.  *Id.* at 1309-10.  Accordingly, the court held that

the defendant's decision to answer the officer's additional questions could not be considered consent to a prolonged traffic stop. *Id*. at 1310.

The facts of this case are extremely similar to *Guerrero-Espinoza*. Here, Barboa-Cecena and Diaz-Ortega remained inside the HHR throughout the traffic stop. Thus, they were unaware of what transpired while Valdez and Zazueta discussed the citation and when Valdez returned Zazueta's documents and told him to have a "safe one." Furthermore, Zazueta had not yet reached the HHR when Zazueta continued the stop by posing additional questions to Zazueta. Finally, Zazueta did not return to the car at any time prior to Valdez approaching the passengers and asking them if he could search the car. Thus, the Court concludes that under *Guerrero-Espinoza*, a reasonable person in Barboa-Cecena and Diaz-Ortega's position would not have felt free to refuse Valdez permission to search the car. Thus, neither the search nor the continuation of the traffic stop was consensual as to Diaz-Ortega.[6]

### C.      Did Valdez' Search Exceed the Scope of Consent?

The passenger defendants, Diaz-Ortega and Barboa-Cecena, argue that Valdez exceeded the scope of their consent when he performed the search of the internal compartments of the HHR.[7] Specifically, they contend that it is objectively unreasonable to believe that by giving their consent

---

[6] In the absence of valid consent, a lawful search of the HHR would require either probable cause or a warrant. It is undisputed that Valdez did not possess a warrant, and the government does not suggest that he had probable cause to search. Although the Court concludes, *infra*, that Valdez did have reasonable suspicion to continue the traffic stop, the Court cannot conclude on the current record that he had probable cause to search the HHR.

[7] In his own motion to suppress, Zazueta does not challenge the scope of the search. Instead, he contends that his written and verbal consent to search was the tainted product of an illegal stop and a subsequent illegal detention. Having found that the initial stop and the continued detention of Zazueta were proper, the Court concludes that Zazueta's argument regarding his consent is moot.

to a search of the car, they were also consenting to have the car dismantled and the molding ripped during the search.  Therefore, they argue that the search exceeded the scope of the consent and its fruits must be suppressed.

When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent, as determined from the perspective of objective reasonableness, determines the permissible scope of the search.  *See Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991).  A general permission to search does not include permission to inflict intentional damage to places or things to be searched.  *United States v. Osage*, 235 F.3d 518, 520 (10th Cir. 2000).  *See also United States v. Santurio*, 29 F.3d 550, 553 (10th Cir. 1994) (noting that a "search was not so invasive as to exceed the scope of defendant's consent to the search" where the officer "did not 'tear up' the van or enter the compartment" until a dog alerted on the compartment); *United States v. Strickland*, 902 F.2d 937, 941-42 (11th Cir. 1990) (holding that a general consent to search a car does not extend to the "intentional infliction of damage to the vehicle or the property contained within it").

The Court concludes that it need not reach this issue.  Zazueta did not raise it, and Barboa-Cecena lacks standing to challenge the search.  With regard to Diaz-Ortega, the Court has already concluded that his consent was involuntary so that as to him, the fruits of the search should be suppressed.  Accordingly, this issue is moot.

## CONCLUSION

The Court concludes that the initial traffic stop was proper, and that the continuation of the detention was proper as to Zazueta.  Therefore, Zazueta's consent to search the HHR was not the "fruit of the poisonous tree."  Zazueta's motion to suppress will be denied, except with regard to Barboa-Cecena's statements made during Valdez' improper inspection of the VIN number on the doorjamb.

24

The Court concludes that Diaz-Ortega has standing to contest the search of the HHR, and that his consent to the search of the vehicle was involuntary.  His motion to suppress will be granted with regard to Barboa-Cecena's statements made during Valdez' improper inspection of the VIN number on the doorjamb, as well as all evidence found during the search of the HHR and all statements by Diaz-Ortega subsequent to that search.

Finally, the Court concludes that Barboa-Cecena lacks standing to challenge the search of the HHR.  Therefore, his motion to suppress will be denied except as to Barboa-Cecena's statements made during Valdez' improper inspection of the VIN number on the doorjamb.


**IT IS THEREFORE ORDERED** that (1) *Defendant Eder Zazueta's Motion to Suppress* [Doc. No. 54] is **GRANTED IN PART and DENIED IN PART**, and (2) *Defendants' [Carlos Diaz-Ortega and Jesus Barboa-Cecena] Joint Motion to Suppress and Memorandum in Support Thereof* [Doc. No. 53] is **GRANTED IN PART and DENIED IN PART.**


**UNITED STATES DISTRICT JUDGE**

25